Jones, C. J.
This was an action of assumpsit on a policy of insurance, against loss or damage by fire, to a china or porcelain manufactory, in Lewis-street, in the city of New-York.
The policy was in the usual form, insuring the plaintiff, for the term of one year, against loss or damage by fire, to the amount of $3000, upon the buildings composing the factory, and on the machinery, tools, horses, and stock, finished and unfinished, contained therein.
*603 The destruction and loss of the premises to the plaintiff, by fire, within the year from the date of the policy, was and the defence is, first, that the buildings were unfinished, and that carpenters were at work upon them at the time of effecting the policy, and that the same, and the unfinished state of the buildings not having been sufficiently described and truly represented to the insurers, the policy never attached. Secondly, that a carpenter’s shop was permitted on the premises, up to the time of the fire, without the license or consent of the insurers, and against the express provisions of the policy, whereby the contract of insurance was avoided or suspended. And thirdly, that the actual state of the buildings, at the time of the application for insurance, was misrepresented to the insurers, and the fact of the carpenter’s shop therein, concealed from them, whereby they were misled, and the insurance obtained at less than the rate of premium, which, upon a full disclosure of the truth of the case, would have been required for the risk.
Whether the buildings were finished or not, at the time of effecting the insurance upon them, was a question of fact for the jury. It was much litigated at the trial, and the verdict of the jury upon the point was against the defence. We are not dissatisfied with the result. The evidence relied upon to show the unfinished state of the buildings, was the testimony of some of the witnesses, that carpenters were at work on the interior of them, for some time after the date of the policy. But the defendants own witness, on his cross-examination testified, that after the first of January, 1827, very little remained to be done to the buildings, and that he considered them complete. The policy was not effected until the ninth of that month. At that time the manufactory had commenced its business, and the application was for insurance upon it, as an establishment in operation. The surveyor of the Eagle Fire Company, with a view to insurance upon it by that corporation, had inspected and surveyed the premises and had made a report of his survey, to which the policy of that office referred, and which survey and report were adopted by these defendants, after a *604 further examination of their own surveyor, to test its accuracy, as the basis of their contract.
Is it probable, that buildings surveyed by the proper officer an insurance company, whose duty it was to inspect and examine them, and reported by him as a factory in operation, would be in such an unfinished and imperfect state at the time, as not to be insurable unless by a special policy ? Must not the actual state of them be presumed to have corresponded with the report; and especially, will not such be the intendment against the insurers, whose ordinary and adopted agents made the survey and report on which they acted? Then, was it not incumbent on the defendants, when they afterwards came into court, to disprove the statements of their own officers, to sustain their objection by clear and decisive evidence ? Yet the witnesses on whom they rely as proving the buildings to have been unfinished and incomplete, testify so loosely and with such discrepancies and want of recollection, as to dates, that the jury could attach but little weight to their opinions-; whilst the surveyor of the Eagle Company, who inspected the premises, adhered to his original representation of the buildings, as complete, and on being shown a sketch of them, exhibited by the applicant for the insurance to the officer, and the endorsements upon it, attested to the accuracy of the description they contained ; and that company, whose policy was on the same interest and in the same terms with that of the defendants, and was prior in date, was so well satisfied with the truth and correctness of the description, that they settled the loss without suit.
But without dwelling longer on this subject, we are satisfied that the weight of the evidence was in favor of the position, that the buildings were substantially finished before the policy was effected; and that the carpenter who remained in the "assured’s employ at the time of the fire, was retained, not to complete the buildings, but for the legitimate purposes of the establishment, in the transaction of its business after it went into operation. The finding of the jury was in accordance, therefore, with the evidence before them and it ought not to be disturbed,
*605 The second ground of defence which was taken to the alleged use of an apartment in building No. one, for a shop, objected to the appropriation of the room in the premises for the accommodation of the carpenter, as a deviation from the engagements of the assured, and as a violation of the provision of the policy, against unauthorized extra-hazardous risks. It turned chiefly upon questions of law. No evidence was offered by the defendants in support of the fact it affirms, but they contend that the testimony on the part of the plaintiff himself showed that the room in the building number one, which had been designated and described as a store room for painted ware, had been appropriated to the use of the carpenter who remained in their employ, and used by him for his shop from the time of effecting the insurance to the time of the loss. It is admitted that the room in question, at the time the policy was effected, did contain a carpenter’s work bench and tools, and that a carpenter was constantly at work there, in making moulds and boxes, and in putting up shelves for the use of the establishment, from the date of the policy to the day preceding the fire, and that the apartment had not at any time been used as a store for painted ware.
But the plaintiff insisted that a carpenter was a necessary workman to be attached to the establishment, and that his employment and accommodation in the buildings insured, were justified by the ordinary requirements of the manufactory and by the usage of the trade, and he denied that such use and occupation of the store-room, by a workman attached to the establishment, was prohibited by the policy, or that he was bound to disclose the circumstance to the insurers, or that his silence in relation to it amounted to deception, or a culpable concealment or misrepresentation in the description he gave of the property and the purposes to which it was applied. Witnesses were called by him to prove that a carpenter was a necessary workman for him to employ in his manufactory, and that such a workman is usually attached to such manufactories, and at all times employed therein.
The bearing of this fact, of the occupation of a part of the *606 building by a carpenter, upon the rights of the plaintiff, and the importance to him of the explanation he gives of that occupancy, will p,e seen jn the sequel. But before we can understanding^ discuss the merits of this branch of the defence, or the charge of misrepresentation and concealment which it involves, we must look into the contract, and see what the description was which the assured gave of the premises proposed for insurance, and what the obligations were which the contracting parties came under to each other.
The insurance is upon six several buildings, numbered from 1 to 6 inclusive, and together oecupied as a china factory, and on machinery, tools, horses and stock, finished and unfinished, contained therein. By one of the printed clauses in the policy, it is declared by the contracting parties, that the policy is made and accepted in reference to the proposals and conditions thereunto annexed, which are to be used and resorted to, in order to explain the rights and obligations of the parties thereto, in all cases not therein otherwise specially provided for. And by the first of the conditions annexed to the policy, it is provided that applications for insurance on property out of the city of New-York, must be in writing, and contain the specifications in and by the said condition set forth and required to be given; and that if any person insuring any buildings or goods in that office, describes the same otherwise than as they really are, so that the same shall be insured at less than the rate of premium specified in the printed proposals of the company, such insurance shall be void and of none effect.
The report No. 5306, referred to by the policy, as filed in the officeof the Eagle Company, was produced and proved,and a copy of it is annexed to the case. It describes the buildings, by giving the location and dimensions of them, and the materials wherewith they were constructed. And the surveyor by whom the report was made, and who was called as a witness by the defendants, testified that they were, at the time of the survey, occupied and used for the purposes of a china manufactory, as represented by the plaintiff. And on being shown the smaller plan or sketch of the premises, and the endorsement thereon, which constituted or accompanied the plaintiff’s application for *607 insurance, he admitted and declared, that the same contained a true and correct.statement of the occupation of the buildings on the 9th of January, 1827, the day of the date of the policy, and that the buildings, as specifiedin his ownreport, were complete and finished.
By the endorsement on the smaller plan, or application for insurance, to which the witness referred, it appears that the description there given of the occupancy of the building-No. one, is as follows, to wit, that the first floor was used as a painting room, an office, a laboratory for the preparation of colors, a store room for finished painted ware, and a painting kiln; the second floor as a turning room. In this building, and in the room intended for the receipt of the finished painted ware, the carpenter had his work bench and tools, and was accustomed to work, and the omission to communicate that circumstance to the company, when the application was made for the insurance of the buildings, is the concealment complained of, and the defect in the description, which is relied on as vitiating the contract. With these explanations, we are prepared to consider the form in which the objection is presented to us, and the legal effect it may, in any of its aspects, have upon the rights of the plaintiff. It is chiefly urged as a breach of a warranty, which the description of the apartment, as a store room for “ finished ware,” is supposed to import. The proposition is, that the description of the buildings in the plans or surveys alleged to have been furnished to the defendants by the plaintiff, at the time of effecting the insurance, was a warranty, on the part of the plaintiff, that the buildings were such, and were used, and to be used for such purposes only as were represented by those plans or surveys, and that the store for painted ware, in building No. one, being in fact not so occupied at the time of effecting the policy, but then being used as a carpenter’s shop, was a breach of the warranty, and that the policy, for that reason, never attached.
This objection was made the ground of a motion, at the trial, for a nonsuit; but the motion was denied, and the Judge, in Ms charge to the jury, instructed them, that the description of the room in the survey referred to by the policy, as being a room for painted ware, was not a warranty in the literal sense of the *608 term, and did not affect the policy, unless material to the risk And to this charge, the defendants excepted.
The first and leading question, then, upon this point is, whether the description contained in the report to which the policy refers, was, in judgment of law, a warranty in the literal sense of the term, or a representation. If the report and surveys to which the parties refer, were furnished by the assured to the company, and did describe the room in question a? a room for painted ware, and if the description thus given of the room, is to be viewed as a strict warranty by the plaintiff, of equal force and effect as an express formal condition, that it should be used as a store room for painted ware, and for no other purpose, the use of it permitted to the carpenter, however innocent and innoxious it may be, was still a departure from the literal compliance with the engagement which he was bound to observe, and might work a forfeiture of his contract, or in other words, prevent it from attaching. But if it is to be considered as a representation only, and is free from fraud, a substantial compliance' will be sufficient, and no deviation or failure will be a defence to the insurers, unless it operate to increase the risk.
Then, was the description of the room contained in the report, or in the application, a warranty, or was it "simply a representation of it, as a store room for painted ware ? It is a general rule, that a representation, to have the effect of a warranty, must be contained in the deed or writing itself, which creates or manifests the contract of the parties, and must be part of the contract. It derives its title to the strict and literal compliance which is exacted of him who is bound by it, from the consideration of its being a condition precedent, which he assumes upon himself, and which must be complied with, to entitle him to the benefit of the contract, or give him the right to enforce it by action against the insurer. Hence it is, that a substantial compliance is of no avail, but that it must, if affirmative of the existence of a fact, or of the verity of a positive allegation, be literally true, and if perspective, either for the observance of an executory engagement, or the performance of a promise, it must be strictly fulfilled. But to give it this controling *609 operation, it must be a part of the contract, and appear on the face of the policy. [Marshall, 349-451. Pawson v. Watson, Cowp. 785.] So inflexible is this rule, that written instructions for effecting the insurance, (Cowp. 785,) a written memorandum inclosed and folded up in the policy, or a slip of paper annexed to the policy, at the time of subscribing it, (Doug. 12,) have been held, not to amount to a warranty.
In the case before us, the description of the room, which is supposed to represent it as devoted exclusively to the storage or deposit of the finished painted ware, and which is insisted upon as a warranty, does not appear in the policy, but is found in the report of the surveyor, or in the application of the assured, which makes no part of the policy. But it is said that the policy refers to the survey and report for the description of the buildings, and adopts them as part of the contract. The policy does refer to the survey, and it refers also, and much more speeially, to the report of the surveyor of the Eagle Company, but it incorporates neither of them into the contract, nor does it refer to them as part of the agreement between the parties. It selects from them, and incorporates into the policy so much and such parts of the description as it was deemed proper to insert therein ; and the fair intendment is, that those parts only of the description were agreed to be adopted as part of the contract, and the residue of the report or surveys, if to have any legal effect, to be left on the footing of representation merely. The policy does not declare the report, or the surveys to which it refers, to be parts of the contract, nor does it use any language calculated to impress them with that character. It is not probable that the assured would have assented to any such reference to those documents, with the understanding that they were thereby to become part of the agreement, and a warranty of the truth of the statement they contain to the very letter, on pain of the forfeiture of his insurance. Both the survey and the report are ordinarily the acts of the agents of the insurers, and the statements they contain are the results of the inspection and inquiry of those agents, and not the representations of the assured. His statements are made in his application for insurance, but upon *610 these the insurers, where the premises are accessible to their own surveyor, seldom act. It is the duty of their own officer to inspect and examine the property, and to make a report thereon for the government of his principals.
The report and survey, m the present instance, had been made for the Eagle Company, the prior insurers, and were adopted by these defendants. And it appeared in evidence, on the trial, that these defendants themselves, also caused the premises to be inspected by their own surveyor, previously to taking the risk. It further appeared that there were two plans or surveys, a larger and a smaller one, which differed in this unimportant particular, that no mention was made, on the larger survey, of the specific purpose to which any apartment or building was to be appropriated ; but that the smaller plan or sketch alone contained the description now relied upon as the warranty. At the first trial, it did not distinctly appear which was the survey of the insurers’ agent, or by whom the smaller plan, designating the uses to which the buildings were to be applied, was prepared.
I inclined to the opinion, that the smaller plan,w’hich designated the uses to which the buildings were to be appropriated, and which had the appearance of a sketch merely, and did not resemble a regular survey, was the application of the plaintiff to the Eagle Company for insurance, and not the survey or report made by the surveyor, for the information of the company, to which the policy refers. This opinion was confirmed by the president of the Eagle Company, who, upon his examination as a witness in the cause, testified that the two papers marked 5306, were original surveys or reports belonging to that office ; that the” first, or smaller one, was brought by the plaintiff at the time he applied to that office for insurance upon the factory, and that the second paper was, as he believed, a survey of the same premises by the surveyor of the company. If such be the true history of the two papers, it is manifest that the smaller one was the application of the assured, as its whole appearance indicates it to be, and was, in no sense of the term, either a report or survey of the premises, but a mere sketch to show the general location of the several buildings which composed the establishment, and *611 a designation of the purposes for which they were intended. And upon that view of the subject, the supposed intention of the ties, to refer to that paper, and to adopt its description, will disappear, as the reference is to the report of the surveyor, and not to the application for insurance. But the two plans both come from the files of the Eagle Company, and each is marked with the number 5306, and both may have been before this company when they took the risk and adjusted the premium. Yet, as the reference is to the report, and not to the plaintiff’s application, we must look to the report, I apprehend, and not to the application, for the description, which the policy intended to adopt.
But if it can be supposed that the application for insurance, or smaller plan or sketch of the premises, was intended, by the report to which the policy refers, and that the purpose of the reference was to adopt the description, which that plan or sketch contained, and to hold the plaintiff to it, how does it become thereby a warranty on the part of the plaintiff? It will, in its character and legal effect as a representation, be available to the insurers, in its broadest extent, for all beneficial purposes; but by converting it into a warranty, the assured may be inconvenienced, or wholly defeated by some unintentional deviation from the strict letter of the description it contains, without any substantial advantage to the insurer, as respects the risk, from keeping him to such a literal adherence to the words he may happen to employ.
The cases cited by the defendants, it is true, establish the doctrine that a description of the subject of insurance may, when embodied in the policy, amount to a warranty that the subject is such as the policy describes it to be. In all the cases, however, where a warranty has been held to arise from the description of the subject, or the expressions of the parties, that description, or those expressions, have appeared on the face of the policy. No authority has been shown for extending the rule to descriptions or expressions contained in other documents to which the policy may refer; and such an extension of the rule would, I think, be unwarrantable, unless the reference to the collateral writing be such as to clearly make it a part of the contract. It was on this latter ground, that in policies against *612 loss by fire, the obligation imposed on the assured by the printed proposals annexed to the policy, to procure the certificate of the minister, or church-wardens and parishioners, of the reality of the loss, and the fairness of the claim, has been held to be a condition precedent to the right of the assured to recover, which cannot be dispensed with, though the certificate be wrongfully withheld; for the policy, in such cases, not only refers to the writing which is attached to it, but the express undertaking of the insurer is to pay the loss according to the exact terms of the printed proposals. They are consequently made a part of the policy.
So the policy, in the case before us, expressly declares that the insurance is made in reference to the proposals and conditions annexed to it, and that the loss is to be paid according to the tenor of the conditions. But the reference in this policy to the surveys and report, is in very different terms, and obviously for very different purposes, and does not profess to adopt either as part of the contract, nor is either of them indispensable to an intelligent and rational construction of the policy.
In the case of Fowler v. The Ætna Ins. Company, (6 Cowen, 673,) the description of the subject insured, which was held to be a warranty, was contained in the policy itself, and was, moreover material to the risk. The policy was on the stock in trade of the plaintiff, described as being contained in a two story framed house filled in with brick. It appeared in evidence, that the house was a wooden building with hollow walls, and not filled in with brick. The Judge at the circuit, held the description to be a warranty, but received evidence to show, that the misdescription was a mistake, and not fraudulent; he evidently viewed the constructive warranty, created by the description of the building as qualified, and controlled by the first condition annexed to the policy; and on that hypothesis, charged the jury, that if the description was not made fraudulent for the purpose of obtaining insurance at a reduced rate of premium, but through mistake, the plaintiff was entitled to recover, and a verdict was given accordingly in favor of the plaintiff. It was contended in support of the verdict, that, the description was a *613 mere matter of representation, and not a warranty. A distinction was taken between marine insurances and those against loss by fire ; and it was urged, that marine policies were a peculiar class of contracts, and that their meaning was settled by judicial decisions ; but that the construction ot policies against loss by fire, must rest on general principles, and that on principle a mere representation could not, because introduced into the contract, be considered a warranty, but that the proposals annexed to this class of policies and made part of them, show the meaning of the parties, and provide substantially that mis-description shall not vitiate, unless it be fraudulent. But the court held, that the description was a warranty, and being a condition precedent, must be fulfilled by the assured, to entitle him to sustain his action on the policy, and negligence, mistake, or mis-representation, would not excuse his failure in the strict performance of the condition, or entitle the plaintiff to recover. The court discountenanced the idea, that a description of property insured by a policy against fire, was to be considered differently from a description in a marine policy, and laid no stress upon the condition in the proposals, to which the plaintiff adverted, as qualifying the warranty created by the description of the building in the policy, in the case before them.
That case then, goes to establish the principle, that a misdescription in the body of the policy will vitiate the contract, whether it be fraudulent or not. But it lends no aid to the proposition, that a description in a report or survey, not incorporated in a policy, nor attached to it, as part of the accompanying instrument, is to be held a warranty, simply because the policy refers to it, as containing a further specification of the property insured.
In the case of the New Castle Fire Insurance Company, appellants, v. Macmorran & Co., respondents, on appeal from the Court of Sessions in Scotland, to the House of Lords, (3 Dow. 255,) the insurance was upon a cotton and woollen mill with the machinery, engines, utensils, and stock of cotton and wool therein; and the policy in addition to the description of the mill, contained an express warranty of the following tenor, to wit, “ warranted that the above “ mill is conformable to the first class of cotton and woollen rates de- *614 “ livered herewith.” The class of rates referred to by the policy, was one of a set of classes of hazards and rates of premiums, specijn printed proposals accompanyingthepolicy, and it was shown that besides being referred to, a copy of the proposals was always delivered to the party insuring, with the policy. It appeared, that the premises at the time of the date of the policy, were .of the second class, and were not conformable to the first class of rates, and the insurers insisted that the warranty was not complied with, and the contract never had effect. It further appeared, however, that the agent of the company had taken.it for granted, that the premises were of the first class, and had made out the policy accordingly, without any representation on the part of the insured. Other matters were also in evidence which may have influenced the opinion of the Court of Sessions, and that court upon a view of the whole case, gave judgment for the assured against the company. The precise grounds of the decision do not appear. But the House of Lords, on the appeal, reversed the judgment on the general ground, that the mill being warranted by the policy as of the first class, but being in reality of "the second class and not of the first, the contract never took effect, and that the judgment of the Court of Sessions was clearly erroneous.
In that case the warranty was material, for it appeared that larger premiums would have been required for the insurance of a mill of the second class, as being more hazardous than mills of the first class. But the court laid no stress on that circumstance ; they held that the warranty, being a condition precedent, whether it was material to the risk or not, was of no importance. And Lord Chancellor Elden, distinguishing between representations and warranties, stated it, as a first principle of the law of insurance, that a representation is open to inquiry into its materiality, and that if it should not be material, its inaccury, or a deviation from the tenor of it, may be excused; but that when there is a warranty, it is a part of the contract that the matter is such, as it is represented to be; and the materiality or immateriality, is, therefore, a matter of indifference, the only question being as to the mere fact which is affirmed or represented to exist. But that ease, which so fully carries out *615 the principle of a literal and strict compliance with a warranty, in no respect relaxes, but in effect confirms the rule, that a representation or assurance, to impress it with the character of a warranty, must be incorporated in the contract, and compose part of the agreement between the parties.
The warranty upon which the decision of the court turned, was embodied in the policy, and constituted part of the contract. No recurrence was had to extrinsic evidence, or to any collateral document or writing to establish it. The printed proposals to which the policy refers, as delivered with it, was not resorted to or used as proof of the warranty, but as an item of evidence, to show the mere compliance of the warrantor with his engagement, by showing that the mill was not of the class to which it was warranted, by the policy, to belong. It was because the assured had permitted the mill to be represented in the policy, as being conformable to the first class of cotton and woollen rates, and had accepted the contract with that condition in it, that he was held bound to establish the fact without regard to its materiality, and disabled by his own compliance with the condition, notwithstanding the extenuating matters shown in excuse of his failure from enforcing his contract against the company.
In the case of Higginson v. Dall, (13 Mass. 96,) a written memorandum signed by the plaintiff, and delivered by his agent to the broker at the time of the application for insurance, stating among other things, that the policy was to take effect if the vessel should sail with a cargo, and no insurance be made by the plaintiff elsewhere, was offered in evidence as a warranty to show that the policy was void in consequence of an insurance made by the plaintiff abroad. The memorandum was not annexed to the policy, nor was the matter it contained, inserted in the contract; but the defendant offered to prove by the broker, that it was kept with the policy, and shown to the several underwriters before they subscribed the contract. The memorandum though objected to as incompetent, was admitted by the Judge at the trial. But the court, when the question came before them, declared themselves to be, all of the opinion, that it ought not to have been admitted, for the purpose for which it was offered. The *616 principle of that decision was, that the policy itself is the contract between the parties, and that the proposals, statements and conversations which passed between them, prior to the subscription, are to be considered as waived, if not inserted in the policy. It was admitted, that representations which do not appear on the face of the contract, but are often, though not always, contained in the application for insurance, may, when they are material to the risk, and the object is to falsify them, be proved by oral or written testimony; but it was held that warranties must always be inserted in the policy.
In the case before us, the description of the room in question, as a store room for painted ware, is contained in the application for insurance, or in the report or survey made upon the buildings insured; but it does not appear in the policy itself, nor is the report or survey, or the application containing it, annexed to the policy. It cannot, therefore,beheld to be a warranty; but it may, on the general principles of insurance, be taken to be a representation; and, considered in that light, if material and falsified, it will vitiate the insurance.
This brings us to the next branch of the defence, which is, that if the description of the building was not a warranty, it was a representation, and the room in question being represented as a room for the storage or deposit of finished painted ware, and not being so occupied at the time of effecting the insurance, but then being used as a carpenter’s shop, and that fact not being communicated to the insurers, there was a material misrepresentation or concealment, and the policy, for that reason, did not attach, and the Judge should, for that cause, have nonsuited the plaintiff.
It is conceded, that a representation, if it be not fraudulent, and does not tend to increase the risk of the insurer, will not avoid the policy, but that it will be sufficient to comply with it in substance, or to show that it has not been departeddfom, to the material injury of the insurers. I assume that the plaintiff did represent the room, on the smaller plan or survey, which I take to be his application for insurance, as intended for a store room for the reception of the painted ware when finished, and I assume, that this representation, whether the plan in which it appeared was the application for insurance, or a survey of the *617 building, was before the insurers when they took the risk, and may have entered into their estimate of the rate of And the question on these assumptions will be, whether the occupancy of that room by the carp enter, with his materials and tools, as disclosed by the evidence, did materially falsify the representation and increase the risk of the insurers ?
The proof of its materiality was upon the underwriters, who make the defence. I discover no evidence in the case to the point; and the failure of proof is decisive against the objection. The risk incurred, by the occupancy of that part of the building by the carpenter, if it in reality did enhance the risk, was susceptible of proof, and it was indispensably necessary to show it, in order to render the defence available. Unless, therefore, the necessity of extrinsic and oral proof of this fact was superseded, or the absence of such proof was supplied by the internal evidence deducible from the policy, or its accompanying conditions of insurance, this ground of defence cannot prevail.
But it may be said, that the standard of materiality of the assured’s representations, and the effect of their falsity upon the contract, are settled by the mutual agreement of the parties in the first condition of insurance. The rule there given, is, that if any person insuring any building or goods, describes the same otherwise than as they really are, so that the same shall be insured at less than the rate of premium specified in the printed proposals of the company, such insurance shall be void, and of none effect. The trade or vocation of carpenters, in their own shops, is classed in the printed proposals of the company, amongst the extra-hazardous risks, for which 25 cents and upwards per $100 is charged, in addition to the premium specified for the class of risks to which the building may belong •; but there is no proof that the disclosure, by the applicant, of the fact of the use and occupation of the room by the carpenter, would have exposed him to the charge of a higher premium, or that his silence on that point induced the company to insure the buildings at less than the rate specified as applicable to them in the printed proposals. The rates of premium specified in the printed proposals, range from 22 cents to 75 cents upon $100, and where the premises are occupied or used *618 for trades and vocations, or goods and merchandise, deemed ex-25 cents and upwards are chargeable in addition ege orcpnary premiums. Upon turning to this policy, it be seen that the premium charged on the insurance, is #1 12~ cents upon each $100, being the highest premium in the whole range of hazards, and 371 cents in addition thereto; but the same proposals contain a memorandum, stating that manufacturing establishments were to be insured at special rates of premium. This insurance is upon a manufacturing establishment, am| it consequently comes within the memorandum, and hot within either of the enumerated classes of hazards. It was insured at a special rate of premium, and hence it is that we find the assured charged by the policy with a larger premium than that of the highest class of hazards, with the addition of 25 cents per $100 for extra-hazardous risks.
From these views of the contract, it is fair to conclude, that the parties, in settling the special rate of the premium for this insurance, assumed the establishment to be an extra-hazardous risk, and calculated the rate of premium on that principle ; and we have no means of determining whether the disclosure of the fact alleged to have been suppressed or concealed, would have had an influence on the decision or not. The better opinion is, that it would not; for the room was represented as a store for painted china ware when finished, and such ware might, and, as I collect from the evidence, was to stand therein unpacked upon shelves. Now, by the same written proposals of the company, china, (the staple commodity of this manufactory,) glass and earthen ware unpacked, and buildings in which the same are packed, are found classed with carpenters in their own shops, as being deemed extra-hazardous, and chargeable with the extra or additional premium of 25 cents and upwards for each $100 insured thereon. How, then, could it be material to the insurer, whether the building was occupied and used as a carpenter’s shop, or as a store room for painted china ware ? The china ware, and the carpenter’s shop, are alike proscribed as extra-hazardous, and whether the apartment should be occupied by the carpenter’s bench and tools, or by the unpacked china ware, could not vary the risk. *619 Then, does it not follow conclusively, that the representation of the room as a store room for the painted ware of the manufactory,when it was not used for that purpose, but was occupied by the carpenter for his work shop, could not have the effect of causing or procuring the building to be insured at a lower rate'of premium than the printed proposals specify for the hazard ? And if so, the description given by the assured, of the purpose for which the room was appropriated, and his omission to communicate to the company the circumstance of the occupancy of it by the carpenter, at the time, could not amount to such a culpable misrepresentation, or fraudulent concealment of a material fact, as to avoid the policy or vitiate the contract.
But another view was taken by the insurers of the effect they ascribed to the use of the store room by the carpenter. It was contended that the permission of the assured to him, to occupy the room for his work shop, was an illicit and prohibited appropriation and use of it in contravention of the agreement and provision of the policy against the exercise of extra-hazardous trades or vocations within the buildings insured, without the consent of the insurers, and that the effect of this interdicted use of the premises, was to suspend the policy during the time of its continuance. The agreement and provision of the policy to which the objection refers, is in substance as follows: that is to say, “ that in case the buildings “ should at any time after the making of the policy, and during “ the time it would otherwise continue in force, be appropriated, “ applied, or used to or for the purpose of carrying on, or exer- “ eising therein any trade, business, or vocation, denominated ha- “ zardous or extra-hazardous, as specified in the memorandum of “ special rates in the proposals annexed to the policy, unless in the “ policy otherwise specially provided for, or thereafter agreed to “ by the corporation in writing, to be added to or endorsed upon “ the policy, then and from thenceforth, so long as the same shall “ be so appropriated, applied or used, those presents should cease, “ and be of no force or effect.” We have already seen, that in the memorandum of special rates in the proposals attached to the policy, carpenters, in their own shops, are classed among the *620 trades and occupations deemed extra-hazardous, and for the insurance upon which, an extra premium is to be charged. And the defendants insist, that the occupation of the store room, in-building No. one, by the carpenter for his shop, was conclusive evidence of the fact, that it was used' for the purpose of exercising therein an extra-hazardous trade or vocation within' the meaning of this prohibitory clause of the policy, without the-assent of the corporation-, and therefore caused, a suspension- of the policy, which continued until and at the time of the fire.
The answer is, that the carpenter was necessary to- the establishment, and his employment and accommodation in the buildings required and justified by his connexion with the manufactory,, and by the usage of the trade ; that the insurers were bound to ltnow, and must be intended to have known, the course of business and the usa-ge of trade in such establishments, and- that they- must have insured the manufactory with such knowledge, and! thereby virtually agreed, by the policy itself, that the carpenter should beempl oye d andaccommo date din the buil dings, as being necess ary to the prudential managementand successful operation of the factory.
All the witnesses who testify to the point, concur in the opinion that a carpenter is a necessary workman in such establishments. Louis Becasse, one of the plaintiff’s witnesses,, explains- the cause of the retention of the carp enter to have-been, the necessity the conductors of the factory were under,, to em-ploy him. He states, that it was intended to keep hito the year round, and that he, the witness, understands it to be-usual to keep such workmen in such factories. Cooley, the defendants’ own witness, also testifies to his understanding, that it was necessary and usual for a carpenter to be constantly employed in such an establishment: and C'hanon testifies fully to the necessity of such a workman in all such manufactories and to the usage on the subject; he says, that in all china factories it is necessary that there should be a carpenter attached to the establishment, and that he should have a place to work in; that the carpenter is constantly employed in making boxes, shelves, moulds for china, and brick moulds, and repairing such as may require reparation, and is considered as important and necessary *621 as any other workman to the operations of the manufactory. This proof of the necessity of a carpenter, and of the usage manufacturers to employ and keep one as an ordinary workman in such an establishment, is not contradicted, and if it was admissible evidence, of which no question is made, it must, we think, be sufficient to take the plaintiff’s case out of the operation of the prohibitory clause or provision of the policy, and justify the assured in the use he permitted of the store room in question; for one carpenter only was retained by him, and continued in his employ in the factory at the time of the fire. Such a workman was required for the ordinary purposes of the manufactory, and he must have a place to work in.
A carpenter’s shop, therefore, in that sense of the term, was as necessary to the establishment as the painter’s shop, or the store for painted ware. The proof is, that a work bench was left for him in the building No. one, and that he was retained and employed, with the intention of establishing him permanently in the manufactory, as a workman attached to the establishment; and such retention and employment being in conformity to the usage, and sanctioned by it, was permissible, unless the policy expressly forbade it; or if the usage was out of the question,yet if the establishment of the carpenter, with his work shop in the building, was necessary to the management and beneficial use and operation of the manufactory, that department would constitute, a part, and be allowable as a necessary branch of the factory, and on that ground, would be innocent.
Can it be, then, that the general provision which the policy contains, inhibiting the appropriation of the building to extra-hazardous trades, on the pain of the suspension of the obligation of the insurers, was intended, or is to be construed to apply to an occupation necessarily attached to the establishment, which forms a prominent object of the insurance, and without which, that establishment cannot be advantageously or beneficially carried on ? Or must not the restriction be held inapplicable to a trade or vocation, however hazardous, appertaining, or usually attached to an establishment, which the underwriters, with a description of it before them, agreed to insure ? *622 But again: this provision is one of the printed clauses of the policy, and the memorandum of special rates to which it refers, is part of the standing printed proposals attached to all policies, and js the same in substance and in form, whatever the nature or ohject of the insurance may be.
These printed forms, calculated as they are for ordinary risks, and containing the provisions and conditions usually attached to insurances upon them, must necessarily be general and comprehensive in their terms, and cannot be adapted to insurances upon other and special hazards. It is the ordinary course of effecting insurances, that upon each application, a special agreement is made between the applicant and the underwriter, designating and describing the premises required to be insured, and settling the terms of that particular insurance, and the policy is then completed by filling up the blank spaces, left for that purpose in the printed form, with suitable words and clauses to express the contract thus agreed upon. This is the usual mode Of consummating the contract, and it is the general practice to leave the printed form of the policy unaltered, without expunging or modifying the parts of it which conflict with the written clause.
But these written clauses nevertheless contain the elements of contract, and being framed under the immediate eye of the parties, and with a reference to the terms of the previous arrangement between them, they not unfrequently present a contract to which some of the printed parts of the policy are inapplicable; and as effect must be given to the acknowledged intention of the parties, they must necessarily supersede or control such of the printed clauses as would, if enforced and literally applied, be inconsistent with them. In this policy a written is given of the premises insured, which designates and describes the buildings and their contents in general terms as a manufactory of china ware. The agreement is to insure the plaintiff upon a factory of that description in actual operation, and upon the machinery and stock finished and unfinished contained therein. This is a vital part of the contract, and must have its full and entire effect and operation, uncontrolled and untrammelled by the printed parts of the policy. It was *623 the purpose'and design of the memorandum of special rates, to which the policy refers, to enumerate and specify the trades, business and vocations which were supposed to endanger the safety of the buildings insured, and to entitle the underwriter to a higher rate of premium ? and it was the object of the prohibitory clause, to provide that the exercise of those extra-hazardous trades should not be permitted, unless with the assent of the insurers. But that general provision was not adopted, and could not be intended to apply to a trade or vocation, which the policy in terms insures, or by necessary implication permits.
The written and the printed parts of the policy, when they harmonize, are equally operative and binding upon the parties; but whenever they come into conflict, the written clauses, as expressing the special agreement and declared intention of the parties at the time of the contract, must prevail, and the printed parts of the policy be held subordinate, and be taken and construed in a qualified and restricted sense, so as to confine them to the declared purpose and intention of the parties as expressed in the written clauses. On that principle, the express written agreement of the company to insure a manufactory of china ware in full operation, inserted in this policy, necessarily authorized the exercise of those trades and avocations, in the buildings insured, which appertained to the establishment, and were required for the judicious management and transaction of its accustomed operations and business. It follows, that the general printed clause against the exercise of extra-hazardous trades, must be restricted in its operation, to trades which the conductors of a china factory do not require for the transaction of the ordinary business of the establishment, and cannot, be applied to any trade or vocation necessarily or usually attached to such manufactories.
The assured might be restrained from the exercise or toleration of any hazardous or extra-hazardous trade or vocation, within the premises, being itself an independant and separate trade, unconnected with the manufactory insured, and carried on for other purposes distinct from the business of the factory. The restriction might prevent him, for example, from converting the premises into an establishment for the manufacture or storage of *624 gunpowder, and perhaps render it unlawful for him to appropriate or use the storeroom, or any other apartment as a work shop, for the purpose of carrying on and exercising therein, the business and avocation of a carpenter, or workman for customers generally, or for the construction of articles in his line for sale. But that provision cannot surely be held to prohibit to the assured the use of any part of the buildings for any purpose or business which composes part of the establishment described in the policy, or is usually attached to and connected with the manufactory agreed to be insured, merely because it is included in the memorandum of special rates as extra-hazardous.
All manufactories requiring the use of fire heat, are, by the same memorandum, denominated extra-hazardous ; yet fire heat is the principal agent in the manufacture of china ware ; and to deny to the assured the liberty, or right to carry on that manufacture in these buildings, because it requires the use of fire heat, would be to defeat the object of the insurance, and to deprive the plaintiff of the chief benefit of his contract. The proposition, when pushed to that extent, becomes too preposterous to be seriously defended, and it must be equally indefensible in its application to any component part of the manufactory, or any trade, or vocation, inseparably or necessarily connected with its ordinary operations.
But it is suggested, that this carpenter was employed upon the buildings, and devoted a portion of his time in completing the interior of the establishment, and that he was not exclusively engaged in preparing necessary accommodation for the manufacture, storage and sale of the ware.
If the fact were so, I do not perceive how the defendants, upon the proofs in the case, could have any just cause of exception, on that ground, to his situation in the factory, as one of the necessary workman, or to the location of his workshop in the premises ; for if this carpenter was a necessary workman, to be attached to the establishment, and actually filled that place in the factory, his occasional employment in making a fixture, or hanging a door, or otherwise completing the interior of the building, could not change the character of his permanent en= *625 gagement, or connect his regular employment with an unauthorized avocation; nor would his employer be exposed on that account, to the charge of an illicit occupancy, or use of the premises in the accommodation afforded to him in the buildings insured.
But I discover no trace of any such employment at any later period than the first of April. It is in evidence, and the fact is affirmed by the defendants’ own witness, that the buildings were up and enclosed, and a great part of the interior completed before the date of the policy, and the witnesses who entered into details, all agree that what remained to be done, was to prepare and put up racks for drying, to place boards or shelves to set the ware upon, and to hang some doors that were left unhung; that no other work was done subsequently to the date of the policy, and that the whole of that work was finished, and the workmen discharged by the first of April, with the single exception of the carpenter, who was to be attached to the establishment, and one additional workman who continued until the first of June and no longer; and these two workmen were employed upon the racks and shelves,—fixtures which appertained to the business of the factory, rather than the completion of the buildings,—it being one of the regular employments of the carpenter of the establishment to make shelves to set the ware upon.
If then it should be conceded, that the employment of a carpenter upon the buildings insured, in completing them without the license of the insurer, would avoid or suspend the contract, that defence could not avail these defendants, because they have failed to establish the fact. It was incumbent upon them to sustain the charge which was to work the forfeiture of the contract, or to cause the suspension of its obligation upon them. But the testimony not only does not show the carpenter to have been employed upon the buildings, but justifies the conclusion, that he was in the service of the plaintiff, as a necessary workman for the ordinary purposes of the establishment, as a manufactory in full operation, and was engaged at the time of the fire, exclusively in the duties of that employment. And, however .unwarrantable the use made of the buildings by the workmen may have been, the contract of insurance, by the terms of it, could be *626 suspended during the continuance only of such unauthorized use of them. And as the testimony conclusively proves, that they were finished, and the workmen discharged prior to, or certainly by the first of June, the policy from that time at least, if the accommo(ja^jon of the carpenter of the establishment, in the store room did not suspend it, must be admitted to have taken effect $ and it must have been in operation on the 27th July, when the manufactory was destroyed by the fire. The objection is reduced, therefore, to the question of the occupancy of the store room by the carpenter in the service of the establishment, which vve have already discussed,. and to which I now for a moment return.
The insurance was upon the manufactory; the parties to it must be intended to have known that its operations required the use of fire heat, and that a carpenter was a necessary workman to be attached to the establishment, and kept in constant employ by its conductors. The contract was made with that knowledge, and in reference to that use and application of the buildings insured: and the description of the premises in the policy as a china factory, was in effect an avowal of the intention ef the assured to devote the buildings, and an assent of the underwriters, to the appropriation of them to the purposes required for the operations of such an establishment. The carpenters’risk enumerated in the memorandum of special rates, as extra-hazardous, cannot be allowed to obstruct the assured in the ordinary operations of his factory. The agreement, which the insurance of the premises as a manufactory imports, must have its full effect, and the general provision against the exercise of extra-hazardous trades and occupations in the premises, must be so restricted in its application, as to conform to the special intention of the parties, and the insured must con. sequently be, by necessary implication, authorized by the policy to appropriate a convenient and suitable room to the carpenter employed in the factory, for his accommodation as a necessary workman to be attached to the establishment.
These considerations incline me strongly to the conclusion, that the occupation of the store room, by the carpenter, in the manner and under the circumstances disclosed by the evidence *627 before us, was not such an unauthorized or prohibited exercise of an extra-hazardous trade in the premises, as to vitiate or suspend the contract. And when we superadd to them, the usage in proof in the case, it seems to us, that all the grounds of defence resting upon that objection, must be invalid; I am, therefore of opinion, that the motion for a new trial must be denied.
Oakley, J.
The general question arising on this bill of exceptions, is whether a description filed in the office of an insurance company, and referred to in the policy, in general terms, as a report of the situation of the premises insured, is to be considered as incorporated in the policy, and as constituting a strict warranty. If so, it follows, from the established doctrine on the subject of warranties, that any variation, in the actual situation of the premises, from the description, renders the policy void, though it be immaterial, or the mere result of accident or mistake.
Assuming that the same rules of construction are to be applied to fire, as to marine policies, in determining what shall constitute a warranty, and what shall be a representation merely, the general principle seems to be well settled, that an express warranty must appear on the face of the policy, and that any instructions for insurance, unless inserted in the instrument itself, do not amount to a warranty. [1 Con. Marsh. 349. 451. Pawson v. Watson, Cowp. 785. 2 Caines, 142. 3 Kent's Com. 235.] Thus it has been held, that a paper wrapped up in the policy, when presented to the underwriters, or annexed to it by a wafer, does not constitute a warranty; (Doug. 11, notis;) and Phillips, in his Treatise on Insurance, (p. 125,) qualifies the general rule, by saying, that a warranty may be contained in documents, expressly referred to in the policy, and so made a part of it.
This qualification, or leather extension of the rule, rests upon the cases of Routledge v. Burrell, (1 H. B. 254,) and Worsley v. Wood, (6 T. R. 710.) On referring to these cases, it will be found, that the policies, on their face, contained an express stipulation that the insurers were to be liable, according to the exact terms of their printed proposals. It was necessary, therefore, to *628 resort to those proposals, to ascertain the terms of the contract, and, without such reference, the contract itself would be unintelligible. In such a case, no doubt the proposals, thus referred to, may be considered as incorporated in the policy, and as making part of it.
But these cases certainly do not establish the rale, that every paper or document referred to in the policy, is to be considered as incorporated in it. When the policy itself contains a full and intelligible description of the subject matter insured, it is not necessary to look out of it, to ascertain the meaning of the contracting parties. The insurers having a description of the property in their possession, are presumed to insert in the policy itself, as much of that description as they deem material, and by omitting any part of it, they show that they are content to take such.part as a representation merely, and to look to it only, for the purpose of estimating the risk. [1 Con. Marsh. 451.]
In reference to the case now before us, it seems to me that we cannot hold the description, as generally referred to in the present policy, to be a warranty, without violating the plain spirit and intent of the contract. The first condition annexed to the policy, provides that applications for insurance on property out of the city of New-York, must be in writing, and contain a description of it, and that if any person shall describe the same, otherwise than as it really is, so that it he insured at less than the rate of premium specified in the printed proposals of the company, the insurance shall be void.
Here is an express declaration of the object and effect of s representation or description of the subject insured. It is to enable the company to judge of the character of the risk, and any mistake or inaccuracy in it, is evidently considered as not affecting the contract, if it be not material. It is clear, that such a representation cannot be converted into a warranty by a mere reference to it, in the body of the policy, without entirely losing sight of the object for which it is required by the company to be made. Every policy contains such a general reference. It is a part of the printed clause of the instrument, and could never have been intended to convert into an express warranty, with all its *629 legal consequences, a document which the company required to be furnished only as a representation.
As it respects insurances in this city, it is the known practice of the insurance companies, to employ their own surveyors or agents, to examine the situation of the property to be insured, and to make a report of it. That report is always filed, and referred to in general terms in the policy. Where the report or representation is thus the act of the insurers, it would be against all reason and justice to give it the legal effect of a technical warranty.
It could not be considered even as the representation of the insured, for the insurers act upon their own knowledge of the facts, upon which the risk is to be estimated.
It appears to me, from these considerations, that it will accord best with the interest of the parties to these fire policies, to consider nothing as a warranty in any sense, unless it is spread in' express terms on the face of the instrument. This is a plain and simple rule, and does not conflict with any established principle-of law on the subject of insurance. I am of opinion, therefore, that there was no error in the present case, on the part of the Judge, in charging the jury, that the plan or map of the premises insured, referred to in the policy, as a report on file in the office of the Eagle Company, was not a warranty, and that any variation between that plan and the actual situation of the buildings described in it, could not affect the contract of the parties, unless such variance should be deemed material_ in the estimation of the risk.
But it is contended by the defendants, that the actual situation of the buildings, at the time of the insurance, was misrepresented by the plaintiff. That they were represented and insured as finished, while the evidence shows that they were unfinished.
That the buildings insured were represented as finished, I think is very evident. They are stated as “ buildings occupied? in a particular manner; a specific estimate of the value of each is made, and there is nowhere any intimation, that they were otherwise than finished. On looking at the survey of the buildings, as filed in the office of the Eagle Company, (to which the *630 policy refers,) we find nothing to qualify the inference to be from the general terms of the policy. In the survey, the buildings are spoken of as actually in use, and the appropriation of each is specified. The material inquiry then is, were the buildings in question finished on the 9th of January, 1827, the date of the policy ?
The evidence on this point is certainly contradictory and uncertain; yet upon a careful examination of it, I am satisfied that the decided weight of the proof is, that the buildings insured were substantially finished at the time of the insurance. Cowly, a witness called by the defendants, and Orr, called by the plaintiff, concur in stating that they were completed at that time, and that all the carpenters’ work done to the buildings, afterwards, consisted in hanging some doors, which had been left unhung, at the request of Orr. There was not then, in fact, any misrepresentation as to the state of the buildings, at the time of the insurance.
Another ground relied on for the defence is, that at the time of the fire, a carpenter's shop was kept in a part of the buildings, and that this, by virtue of an express stipulation in the policy, suspended its operation, so that it did not cover the property at the time of the loss.
“ Carpenters in their own shops, or in buildings erecting or "repairing” axe denominated extra-hazardous trades, or business, in the proposals annexed to the policy. It may be necessary then to determine, whether the evidence, in this case, shows that there was a carpenter in his shop, or at work in the insured buildings, in erecting or repairing them.
It appears clearly, that at the time of the fire, there was one carpenter in the building. He had a work bench in one of the rooms, with some tools ; but was not then employed in erecting or repairing the buildings. His work consisted in making “ drying racks,” and in plaining boards to set the china ware upon; and it was intended to keep a workman of that description permanently attached to the factory.
I am of opinion, that this cannot be considered as a carpenter working in his own shop, or in erecting or repairing the build *631 ings insured. It would seem rather as a part of the general business or trade of the china factory, and to be specially rized by the policy. If the defendants wish to set up a violation of the clause in question, which is to defeat the insurance, without regard to its efrect on the character of the risk, they must bring themselves strictly within its protection. This, in my judgment, they have failed to do, and the defence on this ground must also fail.
I am of opinion, also, that the plaintiff is entitled to interest on the amount insured, from the time that the loss became payable, according to the terms of the policy.

Motion for a new trial denied.

[C. Graham, Att'y for the plff. J. Leveridge, Att'y for the defts.]