Bosworth, Ch. J.
This is an action on a policy of insurance made and issued by the defendants, bearing date the 23d of June, 1858, whereby they insured the plaintiffs “for account of whom it may concern, against “ loss or damage by fire to the ¿mount of $5,000,' on the *544 .“iron and glass buildings, known as the Crystal Palace, “ situate on Eeservoir Square, between 40th and 42d “ streets, and the east side of Sixth avenue, together with “ the furniture and fixtures now in said building, lately “ owned by the Association for the Exhibition of the In- “ dustry of All ¡Nations, and since vested in John H. “ White, as Eeeeiver, and also such other property lately “ vested in said White’s hands as Eeeeiver, belonging to “ exhibitors, and lately in said White’s custody, and now re- “ maining in said building,” for one year. The building and its contents were destroyed by fire on the 5th of Oct., 1858.
The suit is prosecuted by “ Mann & Eodman ” as plaintiffs’ attorneys.
When the cause was opened to the Jury, the defendants “ moved to dismiss the complaint, or strike the cause from the calendar, on the ground that the plaintiffs were not legally represented before the Court,” insisting that, all actions on their behalf must be conducted by the “ Counsel to the Corporation.”
The motion was denied, and defendants excepted.
When the plaintiffs rested the defendants moved for a nonsuit, on the grounds: First, that the plaintiffs had not shown “ any such right to or ownership of the building as will entitle them to recover in this action; and, Second, “ that this action not having been commenced until the 16th day of April, 1859, is barred by the last clause of the tenth condition of the policy,” which provides that in case any suit be brought “ after the expiration of six months next “ after such loss or damage shall have occurred, the lapse “ of time shall be taken and deemed as conclusive evidence “ against the validity of the claim thereby so attempted “ to be enforced.” The motion was denied, and the defendants excepted.
These exceptions will be first considered. ¡¡STo law has been cited Avhich deprives the plaintiffs of the right to prosecute any suit by any attorney they may deem it for their interest to employ. As they may sue and be sued, they may appear on the record by any attorney they may *545 choose to employ, and may employ any counsel to try their causes and to argue them on appeal, in whose capacity and fidelity they may see fit to trust. We deem these propositions so clear that any argument in support of them is unnecessary.
Eext, in regard to the plaintiffs’ insurable interest. They owned the fee of the ground on which the insured building stood, and therefore, presumptively, owned thebuilding also. On the 23d of March, 1852, the plaintiffs leased the land on which the building stood when insured, to Edward Eiddle, “ whereon to erect” and “for the purpose of erecting thereon a building of iron and glass for the purpose of an Industrial Exhibition of All Eatyms # # * for the term of five years, if required and used by (said Eiddle) for the purpose hereinbefore mentioned for that period, * * * at the yearly rent of one dollar per annum.” It was declared in the lease, that it was made “ upon the express condition” that Eiddle and his associates would erect the building, and at the expiration of the term should “ quit and surrender the premises hereby demised, in as good state and condition as reasonable use and wear thereof will permit, damages by the elements excepted.”
On the 31st of March, 1852, Biddle, by a written and sealed instrument, sold, assigned and transferred to the “Association for the Exhibition of the Industry of All Eations,” the said lease, the premises therein mentioned, and the buildings thereon, for and during the rest and residue of the term. The erection of the building was commenced in January, 1852, andtit was opened about the first of July, 1853. The building covered an area of three acres; the lease expired in 1857; the plaintiffs took possession of the property on the 31st of May, 1858, and were' in possession when the policy was issued; and the defendants then knew that they were in possession.
We think that by the true construction of the lease, the building was to become the property of the Corporation when the lease expired. It was only on the condition that the building should be erected, that the lease was granted *546 at the annual rent of one dollar per annum. The resolution of the Common Council, authorizing the lease, was “ passed on the strength of the fact that they (Riddle and his associates) commenced digging and getting ready for the building in January, 1852.”
By the terms of the lease, Riddle and his associates were to fix the pricé of admission to the building at a sum not exceeding fifty cents for each individual, and these receipts were for their use and benefit, and it was undoubtedly anticipated that they would amount to a very great sum. The covenant to surrender the premises in as good state and condition as reasonable use and wear thereof will permit, damages by the elements excepted, would seem to imply that the building’ was to be surrendered in that condition. The words, the “wear thereof” and “ damages by the elements excepted” do not appear to be capable of application to the land itself.
If it be a correct view that by the fair meaning of the lease, the building was to be the property of the plaintiffs,, then all objections to evidence as to whether it was so constructed that it could be taken down and removed, are untenable. The evidence was wholly immaterial, and could not possibly have prejudiced the defendants as to their other grounds of defense. These views also dispose of the first four requests to charge._ The plaintiffs owning the building and the land on which it stands, it is immaterial, in reference to their right to recover ou this policy, whether they obtained possession by suit at law, or in the way they did.
¡Next, as to the objection that this suit was not commenced within six months after the loss. .
• The loss occurred on the 5th of October, 1858, and the six months expired April 5th, 1859. This suit was commenced April 16, 1859. , The eleventh c®ndition of the policy declares that “ Payment of losses shall be made in sixty days from the date of the adjustment of the preliminary proofs of loss by the parties.” It, therefore, becomes material to ascertain when the preliminary proofs of loss *547 were adjusted by the parties. There would be no right of action until the expiration of sixty days from the date of such adjustment. The ténth and eleventh conditions must be so construed as not to conflict unnecessarily with each other, And where the parties, in good faith, and without any objection that unnecessary time is taken for the purpose, are occupied so long in adjusting proofs, that sixty days from the date of adjustment will not expire within the six months, the policy does not become” forfeited merely because a suit is not brought within the six months, and before the loss is payable. To such a suit, the answer that the money was not due when it was commenced, would be perfect.
The preliminary proofs were served November 30,1858. Objections thereto, by the defendants, were served January 3, 1859. It was not stated, among such objections, that the preliminary proofs had not been served in due time.
Amended proofs were served on the defendants, February 12,1859, and they served further objections thereto on the 18th of February, 1859. Up to this time, the preliminary proofs had not been adjusted by the parties. This suit was commenced within sixty days from this time, viz., April. 16, 1859.
It would seem to be a fair viqw of the eleventh condition of the policy, and of the acts of the parties under it, that the plaintiffs had the right, in good faith, to examine these last objections, and if further amendments were required, to make and serve them. If the plaintiffs, after this, had served further proofs, which were satisfactory to the comjmny, the right of action would not have accrued until after sixty days from such service; and this case, in this respect, is substantially like Ames v. The N. Y. Union Ins. Co., (4 Kern., 253.)
In that case it was provided that the loss was “ to be paid within ninety days after due prooís of loss, amended and completed, should have been filed in the office of the company, in compliance with the terms and conditions of the insurance,” (Id., 254,) and the policy required a suit to be *548 brought within six months after the loss. (Id., 255.) . The . building was destroyed July 5, and proofs were served on the 14th of that month. On the 7th of October objections were made to the proofs, and on the 14th of that month an affidavit was served, to meet the objection. The action was commenced on the 18th of January, 1854. (Id., 256.) The company was applied to for payment January 2,18.54; it was then stated that it would not be due until the 14th, and the person applying was directed to tell the plaintiff it would be paid when it was due. (Id., 258, 259.)
In that case payment was applied for within six months after the loss, and within ninety days after the adjustment of proofs. The answer made to that application was held to be a waiver of a right to insist on a suit being brought before the day on which the company’s officers stated the loss would be payable, viz., January 14th, which was nine days after the six months expired, and the ninety-first day succeeding that on" which the proofs were adjusted.
In this case there was no demand of payment proved to have been made. The complaint- states that the company refused to pay the loss, which the answer does not deny; but the complaint does not state when the refusal was made. But if the proofs are not to be deemed to have been adjusted by the parties, until after the objections served by the defendants on the 18th of February, and a reasonable time to examine them, or even if they are to be deemed to have been adjusted on the 12th of February, 1859, although further objections were served on the 18th, for the reasons that- the further proofs served February 12,1859, should have been accepted as sufficient and are not now objected to as insufficient, then the loss would not be jiayable until April 12th, which was more than six months after the fire. From the 12 th of February there were but 16 days in that month, and 31 in March and 13 in April would be required to make the sixty days.
The principle of Ames v. The N. Y. Union Ins. Co., (supra,) covers this point in the case, and the reasoning .of the Court, in its opinion, discusses this precise state of *549 facts, and declares that the objection now under, consideration is untenable.
It now remains to consider the questions arising on exceptions to the admission and rejection of evidence, to refusals to charge as requested, and to the charge made.
The policy, in the body of it, contains these provisions, viz.:
“And it is agreed and declared to be the true intent and meaning of the parties hereto, that in case the above mentioned premises shall, at any time after the making, and during the time this policy would otherwise continue in force, be appropriated, applied or used, to or for the purpose of carrying on or exercising therein any trade, business or vocation denominated hazardous or extra hazardous, or specified in the memorandum of special rates, in the terms and conditions annexed to this policy, or for the purpose either of storing, depositing or keeping therein any of the articles, goods or merchandise, in the same terms and conditions denominated hazardous or extra hazardous, or included in the memorandum of special rates, except as herein specially provided for, or hereinafter agreed to by this corporation in writing, to be added to or indorsed upon this policy, then and from thenceforth, so long as the same shall be so appropriated, applied or used, these presents shall cease, and be of no force or effect.” * * * “And that this policy is made and accepted in reference to the terms and conditions hereto annexed, which are to be used and resorted to in order to explain the rights and obligations of the parties hereto, in all cases not herein otherwise specially provided for.”
The conditions annexed to the policy declare that “ if, after insurance effected, either by original policy or by the renewal thereof, the risk shall be increased within the control of the assured; or if such building or premises shall be occupied in any way so as to render the risk more hazardous than at the time of insuring, such insurance shall be void and of no effect.”
The following trades and occupations, goods, wares and *550 merchandise (as the policy declares) are deemed hazardous, viz.:.“ spirituous liquors, segars”
The “ memorandum of special hazards,” enumerates “ bakers, steam engines in use, theatres and other places of public exhibition, all trades and occupations requiring fire heat, not before enumerated.'1’
It was proved that the building was erected for the purpose of exhibiting the industry of all nations, and was opened about the first of July, 1853. The- opening of it, as is well known, was a matter of public notoriety, and was attended with much ceremony. The American Institute ■ held its annual fair in this building in 1855, 1856, 1857 and 1858; and in each year was largely attended. All that it had in the building was “ on exhibition, with the exception of the blacksmith’s fire, for repairing the building;” and the forge for blacksmithing in making repairs was “ a portable forge.”
The plaintiffs, after they took possession of the building, by a lease, dated June 25,1858, leased the premises to the American Institute, for one year from the 1st of June, 1858. After the American Institute took possession, they introduced into the premises “ two portable engines and one horizontal pressure engine of about fifty horse power,” but ‘íno new boiler.” No new shafting was put in that year. The portable engines were used for “bread mixing and baking.” The American Institute leased the restaurant to John B. Treadwell, who had' conducted it for several years, and who immediately commenced fitting up his rooms for the same purposes and uses for which he had occupied it in the preceding years. He kept a general assortment of liquors and segars, and had a kitchen, where he cooked all kinds of victuals, and baked biscuit and rolls; substituting an oven for another he had the previous year, which did not bake fast enough. The restaurant had no entrance independent of that for visitors to the fair, and their custom was that relied upon. The restaurant was opened with the fair, and closed when that was ended.
*551 The fair of the American Institute usually opened about the middle of September, and closed about the first of Rovember. It did not keep the building open as a place of exhibition after the fair was closed. This was so in 1856 and 1857. In 1858 the Institute had on its catalogue of articles for exhibition, a little rising of 4,000 in number, about the same in 1857. and the number varied but a few hundred in 1856.
But the building was kept open daily from the close of the fair, from about 8 A. M., until sunset, and this use was continued from the close of the fair in 1857. During this period, “there were three or four steam engines in the building to be tested, and they fired up several times.”
There can be no controversy, that all the articles, machinery, &c., which were in the building, and all the use made of fire-heat or steam, were “ as parts of the exhibition,” except the portable blacksmith’s forge “ for repairing the building.”
When underwriters insure property stated to be used in a designated business, they are deemed to be “acquainted with the business, and with the materials ordinarily and» necessarily used by the trade in prosecuting it. In issuing the policy, they must be deemed to have intended to have included all such materials in the risk.” (Harper v. The Albany Mut. Ins. Co., 17 N. Y. R., 197, 198.)
In the present case, the defendants insured a building, which, and the use to which it was devoted, were matters . of public notoriety, and excited great public interest and attention. It was the only thing of the kind on this continent, and was located in the same city with the defendants. They insured the building, its furniture and fixtures, describing the building as one lately owned by “The Association for the Exhibition of the Industry of All Rations,” and also insured other property then in said building as tlbelonging to exhibitors.” The building had been used as a place of exhibition since July, 1853. The American Institute had regularly held its annual fair in *552 this building, in each of the years 1855, 1856 and 1857, and in 1858, when the fire occurred, was also holding its annual fair for that year. The building had not ever been used for any purpose except for such exhibitions.
The defendants must, therefore, be deemed to have been acquainted, when they issued the policy, with the business or use to which it was appropriated, and with the nature of the objects exhibited, and the means employed to exhibit the various articles shown at the fair, and to have intended to include such business and use, and the employment of all such usual means in the risk. (Harper v. The Albany Mut. Ins. Co., supra; Delonguemare v. Tradesman's Ins. Co., 2 Hall, 589, 620, approved in 17 N. Y. R., 197.)
The Judge charged that the defendants insured the building “to be used and applied for purposes that may have been hazardous and extra hazardous within the meaning of the conditions annexed to the policy, to the extent to which it had been previously applied for the same purpose.” That “this policy was an insurance on this Palace as a place of exhibition, to be employed and used as previously used.”
„ The accuracy of these propositions is supported by the two cases last cited, and by Lounsbury v. Protection Ins. Co., (8 Conn., 459;) Grant v. Howard Ins. Co., (5 Hill, 10.)
These views answer the eleventh request to charge, and also the twelfth, in so far as it involves a use like that previously made of the building.
With respect to the fifth and sixth requests to charge, it is important to notice that there was no evidence that “ any trade, business or vocation ” was carried on in the building, otherwise than as part of the exhibition of the articles placed there to be exhibited; nor was there any evidence that the building was used “ for the purpose of storing or keeping therein ” any article which, in the conditions of the policy, was denominated hazardous or extra hazardous, or which was included in the memorandum of special rates. All the articles there were articles to be exhibited or to be *553 used as means and instruments of exhibiting the products on exhibition.
There was no storing or keeping of any article which was there, within the meaning of those words in policies of insurance, as expounded by judicial decisions. (Hynds v. The Schenectady County Mut. Ins. Co., 1 Kern., 554.)
The charge of the Judge in respect to the matter of these two requests, was correct, and his statement that “ there does not appear to have been any storing of such articles which was not essentially counected with the exhibition itself,” was in strict accordance with the testimony.
The seventh request was that, “if the Jury believed that after the insurance was affected, the risk was increased by any means whatever within the control of the plaintiffs, then the insurance was void, and the plaintiffs cannot recover.”
The eighth was that, if “ the building was so occupied so as to render the risk more hazardous at the time of the fire, the insurance was void, and the plaintiffs cannot recover.”
The Judge charged that the building was a place of exhibition, and that it might be subsequently applied to the purposes to which it had been previously applied. “If, subsequent to that, (that is, subsequent to the time the American Institute took possession,) there is found anything in the evi deuce to make it appear that the purposes of the application of this building were more hazardous than those so stipulated for in the policy, then the policy should be suspended during such application; but if the plaintiffs only continued the same kind of employment as before, then the insurers are responsible.”
“ To these instructions the defendants duly excepted.”
The exception to this part of the charge covers the matter of two sentences, and each and all of the propositions embraced therein. The first sentence is in these words, viz.: “I shall, therefore, instruct you that it was a place of exhibition, and you are to take the purposes to which it was previously applied, as the purposes for which *554 it was to be applied afterwards.” This proposition is sound if the views already expressed are correct. The exception being to this, as well as to two other distinct propositions, it is not well taken, and it is not necessary to consider the other two propositions, with a view to determine whether both or either of them is erroneous. (1 Seld., 422; 3 Id., 266.)
The part of the charge next following, which is excepted to, and which relates to the same subject matter, contains six separate sentences and as many distinct propositions. The observations in respect to the exception last considered are applicable to this.
To make it erroneous not to have instructed the Jury that the policy was void, in either of the two events described, in the seventh .and eighth requests to charge, and make it erroneous to merely charge, in answer to such requests, that the policy would be suspended during the continuance of such increased risk, and more hazardous occupation, the requests should have been accompanied with a qualification. ,
The body of the policy, in express terms, provides that an increased risk or more hazardous occupation, if it arises from appropriating, applying or using the premises “to or for the purpose of carrying on or exercising therein, any trade, business or vocation denominated hazardous or extra hazardous, or specified in the memorandum of special rates” &c., “ or for the purpose either of storing, depositing or Iceeping therein any of the articles, goods or merchandise,” so denominated or specified, shall only suspend the operation of the policy during such appropriation, application or use.
The increase of risk or more hazardous occupation which makes the policy void, must arise from causes other than those which the body of the policy declares shall suspend its operation, and from those only; for the latter class of contingencies is provided for in the body of the policy, and by the terms of that, the conditions annexed to the policy “are to be used and resorted to in order to explain *555 the rights and obligations of the parties hereto, in all cases not herein othenvise specially provided forJ”
■ The matters referred to in the seventh and eighth requests to charge, as being sufficient to render the policy void, are described in the conditions annexed to .the policy, and must, therefore, be something other than those matters which the body of the policy declares shall have suspended its operation, and only that.
The seventh request, to be strictly accurate, should have been, “That if the Jury believe that, after the insurance was effected, the risk was increased by any means whatever, within the control of the plaintiffs, (other than those fairly involved in a use of the Palace as a place of exhibition, as it had been previously used and employed,) then the insurance was void, and the plaintiffs cannot recover.”
It may be quite clear that, subsequent to issuing the policy, the risk was increased by introducing articles belonging to the American Institute and exhibiting them. It may be also clear that the use was substantially the same ‘in all particulars, as in every previous year, from the time the building was erected. Such facts would not entitle the defendants to a charge, in the broad terms of either the seventh or eighth requests.
So, also, "the risk may have been increased and the occupation have been such as to render the risk more hazardous, than it was on the day the policy was issued, but if this increased risk was caused by using the premises for a business within the contemplation of the parties and covered by the policy, it was right to refuse to charge as requested.
So, too, if the increased risk arose fvqm any of the causes which, by the policy itself, were only to suspend its operation while such causes continued, it was right to refuse to charge as requested. These requests, therefore, are too broad, and should have been presented in a modified form, to have made them strictly accurate.
But I think it quite clear, from the points of the appellants, (the appeal having been submitted on printed points *556 and nob argued orally,) that no such distinction was in the mind or intent of the counsel, in presenting his seventh and eighth requests, as that some of the acts of which he complained, and to which he called the attention of the Court, would make the policy void, while others might, possibly, only suspend its operation.
The burden of his points is, that this policy was not an insurance on this Palace as a place of exhibition, and that its general use as such, and various specified acts which were done in and as parts of such use, constituted a bar to the plaintiffs’ right to recover.
There is no statement in the printed points, which refers in terms to the seventh or eighth request to charge. It cannot, therefore, be now said that the defendants make a point that they were not charged in the form of the requests themselves; and this omission to refer to them renders it quite evident that the defendants were not understood at the trial, and did not then intend to have it understood by the Oourt, that those requests, in stating the matters which, if found by the Jury, they insisted would make the policy void, referred to an increase of risk from causes other than those which, the policy itself declares, would suspend its operation.
This will be made quite evident by a brief analysis of the appellants’ points. •
In their specification of the facts claimed to have been proved, and which are relied upon as sufficient to defeat a recovery, they state that, “It was also proved that the American Institute, for the purposes of its exhibition, had introduced into the insured premises many articles, and exercised therein several kinds of business, -which, in the conditions annexed to the policy, were denominated hazardous, extra hazardous, and special hazards, such as glassblowing, baking, restaurants for sale of liquors and segars, with kitchens for cooking, acids, forge for repairing, burning fluid, gas manufacturing, steam engines, a panorama, &c., &c.; all of which articles were not in the building *557 when the policy was executed, but wrere in it when the fire occurred, and had been for about a month.”
The first point is, that “ the Oourt erred in admitting evidence * * * to show the manner in which the building had been used previous to issuing the policy.” And the second is, that “ the Oourt erred in admitting the opinion of an incompetent witness to prove * * that the building could not be taken down.”
The other seven points (exclusive of the argument in support of them) are as follows, viz.:
“III. The Oourt erred in charging the Jury that the legal interpretation of this policy was, ‘ that this was an insuring of this building to be used and applied for purposes that may have been hazardous or extra hazardous within the meaning of the conditions annexed, to the extent which it had been .previously applied for the same purpose.’ ‘ Fol. 293.’
“ IV. The Court erred in charging the Jury that ‘ this policy was an insurance upon this Palace as a place of exhibition, to be employed and used as previously used.’ ‘ Fol. 296.’
“ V. The Court erred in instructing the Jury that, 1 substantially it was continued as a place of exhibition at the time this policy of insurance was made upon the building, because the period between the time that the previous society had ceased to run the machinery, and its occupation by the American fair in 1857, and the period between when it was taken possession of by the plaintiffs, was not sufficient to destroy its character as a place of exhibition.’ “ We submit it cannot be said fairly that this was a place of exhibition at the time this policy was made.
“VI. The Court erred in not charging the Jury as requested at fol. 277, being the 5th request; and also in charging ‘that there did not appear to have been any trade, business or occupation carried on there at any time.’
“VII. The Oourt erred in not charging the Jury as requested at fol. 278, being the sixth request; and also in charging that there did not appear to have been any storing *558 of hazardous articles therein which was not essentially connected with- the exhibition itself. Eol. 302.
“VIII. The Court erred in not charging the Jury as requested at fols. 282 and 283, being the 12th request; and in charging the Jury as set forth at fol. 300.
“IX. The Court erred in not granting the motion to dismiss the complaint upon the second ground, as stated at fol. 17G, being the 13th request; and also in charging the Jury as stated at fols. 302 and 303.
“ X. The Court erred in charging the Jury that the plaintiffs were entitled to recover, as stated at fol. 305.”
These points are prepared under a rule of Court, which requires the appellant to furnish “to each of the Judges * * a printed copy of the points on.which he intends to rely.” (S. C. Buies, Ho. 43.)
These points do not bring the fact of the making of the seventh or eighth requests to charge, to the attention of the Court, nor do they allude to any exception taken for refusing to charge either of them, which is a virtual waiver of the last named exception.
The points, on the other hand, discuss the exceptions to the portion of the charge which covers the matter of these requests, and thus the appellants signify to the Court, that they rely on the supposed errors, which such exceptions were designed to reach.
The appellants, therefore, are not entitled, on any principle, to a new trial by reason of the refusal of the Court to charge in the terms of the seventh or eighth request.
There cau be no pretense that anything new was introduced, not introduced in previous exhibitions, beyond, possibly, a slight increase of the number of articles entered for exhibition, except the portable forge for making repairs, the two portable engines, the horizontal engine, and the altering of the oven in the restaurant.
That the introduction of the portable forge for repairs did not vitiate the policy is, I think, well settled. (Lounsbury v. Protection Ins. Co., supra; Delonguemare v. Tradesmen's Ins. Co., supra; Dobson v. Southby, 1 Mood. & Mal., *559 90 ; Shaw v. Roberts, 6 Ad. & El., 75; O’Niel v. The Buffalo Fire Ins. Co., 3 Comst., 122.)
The alteration of the oven, without proof that its use, in its altered condition, would increase the risk, is not material. (Barrett v. Jermy, 3 Wells, Hurl. & Gord., 3 Ex. R., 535.) Ho evidence of that character was attempted to be given.
The two portable engines exhibited (in their use) bread mixing and bread baking, as part of the exhibition. What was done with the horizontal engine does not very clearly appear; but it does appear that it “ was supplied with steam from the main boiler; no new boiler was introduced for it.”
There is nothing in the proofs in regard to either of these four matters, or all of them combined, or their' use, which would justify a verdict for the defendants.
It would seem to follow, if the views already stated are correct, that, in any fair view of the evidence, the plaintiffs were entitled to a verdict.
The building was insured to be used for the purposes for which it had always been used, and as previously used; and it has not been used otherwise, or for any other purpose.
The only new things introduced, were either for repairing the building, or for exhibiting the articles entered for exhibition.
We think there is nothing in the ninth request requiring any comment.
The plaintiffs were insured “for account of whom it may concern.” The obvious reason is that, among other things, property belonging to exhibitors where names were unknown, was also insured. Possibly, also, for the reason that the Receiver, as well as the plaintiffs, claimed property in the building. But that the plaintiffs claimed ownership, and at the time intended the policy should protect their interest, there cannot be any doubt.
On such a state of facts the policy covers their interest. (1 Phillips, §§ 383, 389.)
. The judgment should be affirmed.
*560 Robertson, J.
The learned Chief Justice has so fully and ably discussed and disposed of all the points urged before the Court in this case, that nothing further is needed to justify his conclusions. I only propose tQ add a few considerations in reference to the eighth and ninth requests to charge, on behalf of the defendants. Of course that part of the charge which refers to a suspension of the policy, while the building was applied to purposes more hazardous than those stipulated for in it, was not entirely responsive to the propositions in both those requests. They involved, substantially, these propositions, that the insurance was void if the risk was increased by any means within the plaintiffs’ control, or if the building was occupied so as to render the risk more hazardous at the time of the fire. In reference to the last of those requests, perhaps it was immaterial, because not injurious to the defendants, whether the court charged that the occupation of the building at the time of the fire avoided the policy, or that the application of it to extra hazardous purposes suspended the policy during such application, the substantial part of both being that the policy was not obligatory, if at the time of the fire the hazard of the employment of the building had been increased. But I apprehend there are two sufficient justifications for refusing both requests, which are: 1st. Their generality; being without any qualification as to the nature of the risk; and, 2d. The absence of any evidence to prove any increase of risk beyond that stipulated in the written part of the policy to be assumed by the defendants.
One of the printed conditions attached to the policy provides that “ if the risk be increased within the control “ of the assured, or the building be occupied to render the “risk more hazardous than at the time of insuring,’’ the insurance shall be void. This is immediately followed by another, that “if the risIt be increased by the erection “ of buildings or the use or occupation of neighboring “ premises, or otherwise, * * it shall be optional with “ the company to terminate the insurance, after notice.” *561 Whether the effect of the word “ othencise,” in that latter clause, changes the effect-of the word “void” into voidability upon notice, is not material. The clauses taken together show that what is meant by the word “ risk,” is danger by the perils insured against. The body of the policy provides for a suspension of its activity in two different contingencies. 1st. During the application of the premises insured to carrying on any business denominated hazardous or extra hazardous, or specified in the memorandum of special rates, in the conditions annexed thereto. 2d. During the storage therein of any articles, denominated in such conditions hazardous or extra hazardous, or included in the memorandum of special rates, except as therein specially provided for. It also contains another clause, that the conditions thereto annexed, are “tobe resorted to in order to explain the rights and obligar “ tions of the parties thereto, in all cases not therein other- “ wise specially provided for” It appears to. me, therefore, very plain, that on the face of the contract, the conditions annexed are not to define the rights and obligations of the parties, under any contingency provided for in the body of the policy. In other words, that the instrument of insurance is not to become void by any increase of risk under the control of the assured, or the occupation of the building so as to render the risk more hazardous, provided the same arise from the application of the building to any of the hazardous, extra hazardous or special occupations mentioned in the memorandum annexed, or the storing therein of auy of the articles designated as hazardous, extra hazardous, or special, therein, but that in such case the operation of the policy is to be thereby suspended while such increase of risk continues in consequence of such application or storage. Among the articles designated as specially hazardous, are “ steam engines in use,” and every article deposited on these premises is to be found in the list of articles annexed to the policy. It is very evident that the conditions were intended to be the last *562 resort to cover by general phrases all increase of danger not provided for in the policy, and only such.
To have made these requests in proper form, they should have been that the policy was void in case the risk was increased by any means under the plaintiffs’ control, or by any occupation of the building for uses or by articles not included in those denominated hazardous, extra hazardous, or specified in the memorandum of special rates annexed; but in case such increase arose from those articles or occupations the operation of the policy was only suspended.
But there is another qualification equally material which should have been added to such requests. The written controls the printed part of the policy, and the body of the contract excepts from the operation of the annexed conditions anything therein specially provided for. It was held, on the trial, that the description of the premises in the written part of the policy ratified their appropriation to the use to which they had had been theretofore applied, and which was included in such description. In that view I feel gratified in being substantially sustained by the learned Ohief Justice. If that be so, no mere positive increase of risk would be sufficient to avoid the policy, unless it arose from something else than the appropriation of the building to uses similar to that to which it had been previously appropriated. Possibly the introduction of new steam engines, and working them, or a bar and its fixtures, might have increased the risk from what it was at the time of the insurance; but if they were the proper appendages of a plan of exhibition of the mechanical, industrial and fine arts, and their products, they were no increase of the perils stipulated to be assumed. The requests, in the absolute form in which they were put, were properly disregarded. And this was one of the grounds upon which such requests were refused, and properly, as I still think.
The instruction, as to a suspension of the policy, was joined with two others, and an exception taken to the whole jointly. The first was, that the purposes to which *563 the premises had been applied were to be the purposes to which it might be applied; then followed the direction that if the purposes of their application were more hazardous than those so stipulated for, the policy should be suspended, but if the plaintiffs continued only the same kind of employment as before, the defendants were liable. The first and last were clearly right upon the principles already laid down, and the general exception to the three was, therefore, untenable. It will be found that this instruction was intended to apply to the clause in the body of the contract referring to suspension of the policy, and not to the clause in the conditions making it void. That had already been disposed of by the instruction that if the premises had been used for storing extra hazardous articles it would be fatal to a recovery, unless, by the terms of policy, such a restriction had been made inapplicable, which is followed by the interpretation of the contract already referred to. Moreover, no harm ensued to the defendants from charging such matter in their favor, however erroneously. And if there w:as no evidence to sustain the charge of an increase of risk by a devotion of the building to other purposes than those whose perils were assumed, the instruction as to the suspension of the policy was wholly irrelevant and harmless.
But, in addition, even if the legal principles included in the propositions contained in such requests were rightly laid down, without the qualifications already mentioned, the evidence (as I think is demonstrated in the opinion of the "Chief Justice) shows that there was no increase of risk beyond that arising from the continuation of the application of the building to the same uses as before. Upon a charge given in the form so requested, the Jury might have been warranted in finding that the repairing forge, portable and horizontal engines, and the repairs to the oven, increased the risk existing at the time of the insurance, but if they also found that the introduction and use of such articles belonged to a place of exhibition of *564 arts and products, I apprehend the first finding would be rejected as immaterial.
There is, therefore, no error in any material part of the charge, or the refusal to charge; the only criticism to which it is possibly amenable, is the superfluity that a suspension of the policy would take place in case of an application to more hazardous uses than those stipulated, and that seems fully borne out by the clause in the body of the policy and the memorandum annexed.
I concur in affirming the judgment and refusing to grant a new trial, and allowing judgment to be entered on the verdict for the plaintiff, with the costs of the cause and the argument of the exceptions to be adjusted.
Barbour, J., concurred in affirming the judgment.
Judgment affirmed.